IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**KAREN F. VARNEY**,                                          Civil Case No. 09-3105-KI

                    Plaintiff,

                                                  OPINION AND ORDER

   vs.

**MICHAEL J. ASTRUE**,
Commissioner of Social Security,

                    Defendant.



        Karen F. Varney
        8602 Wagner Creek Road
        Talent, Oregon  97540

            Pro Se Plaintiff

        Dwight C. Holton
        United States Attorney
        District of Oregon

Adrian L. Brown
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, Oregon  97204-2902

Benjamin J. Groebner
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington  98104-7075

      Attorneys for Defendant

KING, Judge:

Pro se plaintiff Karen Varney brings this action pursuant to section 205(g) of the Social

Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

Commissioner ceasing Varney's disability insurance benefits ("DIB") as of March 1999 based on

her substantial gainful activity ("SGA").  For the following reasons, I reverse and remand.

## BACKGROUND

The Social Security Administration ("SSA") concluded Varney was entitled to DIB

beginning May 1997 due to a back condition.  It subsequently became aware of Varney's report

to the IRS of her self-employment earnings and concluded she was engaging in SGA.

On June 27, 2007, the ALJ issued a decision finding that Varney's trial work period was

completed in February 1999 and that her period of disability stopped in March 1999.  She was no

longer entitled to benefits as of May 1999.  This decision became the final decision of the

Commissioner when the Appeals Council declined to review the decision of the ALJ on

September 2, 2009.  A claimant representative had assisted Varney in the hearing and before the

Appeals Council.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits

to people who have contributed to the Social Security program and who suffer from a physical or

mental disability.  42 U.S.C. § 423(a)(1).

The Commissioner must follow eight steps in making a decision to cease a recipient's

disability benefits.  The first step requires the ALJ to evaluate whether the recipient of benefits is

engaging in SGA.  20 C.F.R. § 404.1594(f)(1).  A recipient may work for a trial period of up to

nine months while still receiving benefits.  20 C.F.R. § 404.1592(a).  The level of activity need

not rise to the level of SGA to be determined trial work.  To meet the criteria of trial work, the

self-employed recipient must have net monthly earnings of more than $200 in 1998, 1999, and

2000, and $530 in 2001, or the monthly hours worked in the business must exceed 40 hours in

1998, 1999, and 2000, and 80 hours in 2001.  Beginning in 2002, work will be characterized as

trial work if the recipient's net monthly earnings are $560 or the recipient works more than 80

hours a month in the business.  20 C.F.R. § 404.1592(b)(2).

In addition, the regulations permit a recipient to work an extended period of time after the

trial work period.  During this time, benefits are stopped due to work activity but can be

reinstated automatically without needing to file a new application or make a new determination

of disability.  20 C.F.R. § 404.1592a.

Earnings over specified levels will "ordinarily show" that the recipient has engaged in

SGA.  20 C.F.R. § 404.1574 (b)(2).  A recipient earning $500 per month or more through June

1999, $700 per month or more from July 1999 through December 2000, $740 per month in 2001, and $780 per month in 2002 will show that the recipient engaged in SGA.  Id.

The recipient bears the burden of proving no cessation in disability.  Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998).

## STANDARD OF REVIEW

The court must affirm the ALJ's decision if it is supported by substantial evidence and is based on correct legal standards.  Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). Substantial evidence is more than a "mere scintilla" of the evidence but less than a preponderance.  Id.  "[T]he Commissioner's findings are upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision."  Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004) (internal citations omitted).

## THE ALJ'S DECISION

The ALJ considered Varney's reported self-employment earnings for 1998, 1999, 2000, 2001, and 2002 on her federal income tax returns.  He concluded, based on those earnings, that Varney completed her trial work period from June 1998 through February 1999.  He also found that Varney's earnings exceeded the SGA levels throughout her period of re-entitlement, which began in March 1999 and continued through March 2002.

Varney explained that the self-employment earnings were largely based on passive income she received from her investment in an LLC.

The ALJ found Varney's explanation for her earnings not credible.  He also discounted the letters from friends and business colleagues.  Finally, he disregarded the testimony of Varney's life and business partner, Brian Schick.

## FACTS

Varney was found disabled beginning November 13, 1996 due to a back condition, and was determined entitled to DIB beginning May 1997.

Varney and Schick formed a limited liability company in 1998 called Sentis Technologies, which provided software development services to various clientele, to give Varney the opportunity to work.  Varney received 25% of the ownership units based on the amount of her investment.  In 1998, Varney's self-employment earnings totaled $2,006 for the period June through December.  In 1999, her earnings totaled $24,106, in 2000 she earned $31,535, and in 2001 she earned $32,305.  In 2002, Varney's earnings dropped to $16,320.

In June 2002, Varney and Schick held a partnership meeting and reduced Varney's ownership share to five percent; the meeting minutes indicate that they made this reduction because Varney worked fewer than ten hours a month on average.  The meeting minutes stated that Varney's primary responsibilities were maintaining the books, giving feedback on database design, and proofreading documents.

After receiving a letter from the SSA, Varney submitted a response dated February 4, 2003 regarding her work activity.  She explained that following her injury she and Schick started a company, in part to give her the ability to work "when I was able[.]"  Tr. 109.  She explained that she received earned income, at rates increasing over the years from $25 to $28 an hour, and worked on average 7.90 to 10.73 hours a month.  She also explained that she received passive

Page 5 - OPINION AND ORDER

income distributed from the LLC.  Her passive income ranged from $987 (beginning in June

1998) to $31,520.68 (in 2001).  She explained,

> I have provided the Schedule SE's requested in the Social Security cover letter
> (These are included as Attachment B).  You will note that the sum of my earned
> and passive income for each as shown above are equal to the total funds I received
> from the LLC, as shown on the various schedule SE's for each year.
>
> I was also requested to provide Schedule C.  I am unable to do this, since as a
> partner of an LLC, I do not receive this form.  (Similarly, I also do not receive a
> W-2, for the same reason).  Both my earned and passive income from Sentis
> Technologies, LLC are received via partner draws, as is often the case in smaller
> LLC's.  All of the company's labor activities are recorded in our
> time/accounting/invoice software system, which is the source of the figures
> provided here, and all company financial information provided to the federal
> government.

Tr. 110.

In January 2004, Varney submitted the same work reports with a summary indicating that

she typically worked twelve to twenty hours a month, and never over 25 hours a month.  She

stated that she earned $200 to $400 per month on average.  She also included the following

statement:

> (Note:  About 90% of the work I have performed at Sentis would be classified as
> bookkeeping and administrative work; bookkeepers and administrative assistants
> in the Bay Area earn approximately $12-15 per hour.  Some of the more skilled
> tasks I performed (as roughly 10% of my hours worked) would be typically
> compensated at about $20/hour.  Sentis averaged these figures and assigned an
> hourly rate of $17 for all work that I perform for the company).

Tr. 104.

## DISCUSSION

The issue in this case is whether the ALJ properly relied solely on Varney's tax returns,

including her self-employment schedules, in concluding that Varney had completed a trial work

Page 6 - OPINION AND ORDER

period and performed substantial gainful activity such that her disability could be deemed ceased.

In doing so, the ALJ rejected Varney's explanation and evidence.  Varney, representing herself in

this matter, asserts that the ALJ made egregious factual errors and failed to comply with the

applicable legal standards.

I.      Test to Determine SGA

Varney contends that the ALJ neglected to address the standards set forth in the Programs

Operations Manual ("POMS") DI 10510.015, the standards that formed the basis of the

arguments she presented to the ALJ.  Although, as the Commissioner points out, the POMS serve

only as guidance and are not judicially enforceable, Lockwood v. Comm'r of Soc. Sec. Admin.,

616 F.3d 1068, 1073 (9th Cir. 2010), the nearly identical regulations adopted by the SSA require

the ALJ to base his decision with regard to SGA on one of the tests outline in Section 404.1575.

(The SGA test is irrelevant for purposes of evaluating whether Varney engaged in a trial work

period.)

The regulations regarding evaluating self-employment activity read, in relevant part, as

follows:

> (a)  *If you are a self-employed person.*  If you are working or have worked as a
> self-employed person, we will use the provisions in paragraphs (a) through (e) of
> this section that are relevant to your work activity. . . .
>
>          . . . .
>
>          (2)  *General rules for evaluating your work activity if you are self-*
> *employed.*  We will consider your activities and their value to your business to
> decide whether you have engaged in substantial gainful activity if you are self-
> employed.  We will not consider your income alone because the amount of
> income you actually receive may depend on a number of different factors, such as
> capital investment and profit-sharing agreements . . . . We will evaluate your work

activity based on the value of your services to the business regardless of whether you receive an immediate income for your services . . . .

(i) *Test [o]ne:[1]*  You have engaged in substantial gainful activity if you render services that are significant to the operation of the business and receive a substantial income from the business.  Paragraphs (b) and (c) of this section explain what we mean by significant services and substantial income for purposes of this test.

. . . .

(b) *What we mean by significant services.*  (1) . . . If your business involves the services of more than one person, we will consider you to be rendering significant services if you contribute more than half the total time required for the management of the business, or you render management services for more than 45 hours a month regardless of the total management time required by the business.

. . . .

(c) *What we mean by substantial income*–(1)  *Determining countable income.*  We deduct your normal business expenses from your gross income to determine net income . . . . (2) *When countable income is considered substantial.*  We will consider your countable income to be substantial if–

(i) It averages more than the amounts described in Sec. 404.1574(b)(2) [$500 per month or more through June 1999, $700 per month or more from July 1999 through December 2000, $740 per month in 2001, and $780 per month in 2002]; or

(ii) It averages less than the amounts described in Sec. 404.1574(b)(2) but it is either comparable to what it was before you became seriously impaired if we had not considered your earnings or is comparable to that of unimpaired self-employed persons in your community who are in the same or a similar business as their means of livelihood.

20 C.F.R. § 404.1575(a).

The ALJ neglected to make any findings as to whether Varney met any of the tests for

performing SGA during her reentitlement period.  Instead, the ALJ concluded Varney had failed

---

[1]Tests Two and Three are relevant only if an individual does not meet Test One.

"to rebut the presumption that the actual amounts of self-employment earnings reported by the claimant at the end of each of the relevant tax years should be accepted at face value."  Tr. 28. This is not the test.

The ALJ's failure to make findings under any of the three tests constitutes error as a matter of law and requires a remand.  Gaudreau v. Comm'r of Soc. Sec., 160 F. Supp. 2d 285, 293 (D. Conn. 2001) (remanded to make findings required by regulation); Brown v. Astrue, No. 09-1331-SAC, 2010 WL 5137542, at *5 (D. Kan. Dec. 10, 2010) (remanded on issue of significant services); Brown v. Astrue, No. 3-07-CV-1095-N, 2008 WL 5232797, at *3 (N.D. Tex. Dec. 12, 2008) (remanded on issue of significant services).

I cannot accept the Commissioner's invitation to infer from the ALJ's decision that he made the relevant findings for purposes of Test One.  With respect to the first part of the test–whether Varney performed significant services–the ALJ found Varney's work "integral to provision of the business' services,"  "necessary to generate the business' income," and "work" rather than a "passive income producing source such as stock ownership," but he did not make a finding that Varney "contribute[d] more than half the total time required for the management of the business" or that Varney "render[ed] management services for more than 45 hours a month[.]"  Cf. Tr. 29 with 20 C.F.R. § 404.1575.  The ALJ did not believe Varney with regard to the number of hours she worked (approximately ten on average), but he did not make a finding as to how much work she performed or that it was more than half the total time required for managing the business.  Indeed, the ALJ commented that Varney's "work activity may have been less than full time, or even relatively minimal[.]"  Tr. 28.

Page 9 - OPINION AND ORDER

Although I could infer from the ALJ's decision that he made a finding with respect to the second prong of the test, findings on both significant services and substantial income are required in order to find that a self-employed individual is engaging in SGA. The ALJ erred.

II.       Varney's Credibility

The two main reasons the ALJ gave for finding Varney not credible were that she provided incomplete tax records and that there was a "major discrepancy" between her testimony and the testimony of her life and business partner. Tr. 27.

The ALJ accepted Varney's self-employment tax returns at face value because he found she had failed to present evidence "to the contrary[.]" Tr. 25. He noted:

> As detailed below, the Administrative Law Judge notes that a variety of business
> and tax records have been requested from the claimant, but her responses have
> been incomplete, and portions of income tax returns have been provided only
> selectively, not completely, such that the Administrative Law Judge is able to
> consider only the documentary evidence of record.

Tr. 24. Varney disputes that the ALJ requested the tax documents for the relevant years or that her responses were incomplete. It was not the ALJ who requested the documents, however. As I quoted above, in response to the SSA's request, Varney submitted only her Schedule SEs and not her K-1s. Thus, the ALJ's conclusion that Varney's responses to requests were incomplete is supported by substantial evidence in the record.

Nevertheless, Varney contends that she submitted her complete tax returns on August 20, 2006, just before her hearing before the ALJ. The record reflects that Varney intended to submit her tax returns. Her representative's memorandum to the ALJ refers to "Exhibit 2: Claimant's Tax Returns." Tr. 221. However, the fax cover sheet accompanying the memorandum and exhibits neglects to reference Exhibit 2 and the tax returns. The cover page indicates that the

Page 10 - OPINION AND ORDER

representative faxed 22 pages, consisting of the appointment of representative (1 page), fee

agreement (1 page), letter regarding upcoming hearing (1 page), memorandum (9 pages), and

Exhibit 1 (10 pages).  Exhibit 2 is not included.  Tr. 229.  Since the case must be remanded for

the ALJ to make the findings required by 20 C.F.R. § 404.1575, Varney is directed to submit a

complete set of her tax returns for the relevant years in question.  Additionally, since the ALJ

will have a chance to review a complete set of tax returns, the ALJ is also directed to evaluate

whether his findings with regard to the trial work period are affected.

Varney is correct that the ALJ erred in finding a "major discrepancy in testimony"

between Varney and Schick that "highlight[s] the inference/conclusion that the claimant actually

works more than she is admitting."  Tr. 27.  According to the ALJ, Varney testified that she did

not work more than 45 hours per month, while Schick testified that Varney has never been able

to work more than 10 hours per month.  Contrary to the ALJ's conclusion, the testimony is not

contradictory as both statements could be correct.  Indeed, Varney simply answered her

representative's question, "[C]an you truthfully say you never once worked over [45 hours a

month]?" with "Absolutely."  Tr. 281.  Normally, the fact that the ALJ improperly considered

some reasons for finding plaintiff's credibility undermined does not mean that the ALJ's entire

credibility assessment is improper.  Batson, 359 F.3d at 1197.  However, here, the fact that the

ALJ placed this fact front and center in his analysis of Varney's credibility, and the fact that he

viewed it as a "major discrepancy"–which is so obviously incorrect–warrants a remand to the

ALJ to re-evaluate Varney's credibility.

I do note, however, that the ALJ made several findings that are supported by the record,

and I recite them here for the benefit of the parties.

First, the ALJ pointed to the difference in rates Varney ascribed to her work in her 2003

and 2004 work activity reports.  In 2003, she said she earned between $25 and $28 an hour,

increasing over the years, but in 2004 she lowered the rate to $17 an hour for every year worked.

Varney did explain that the lower rate was supported by the rates bookkeepers and administrative

assistants earned in the Bay Area, but she also noted that $17 was the hourly wage that Sentis

assigned to her.  Tr. 104; see also Tr. 121 (Schick too asserted that the $17 an hour rate was one

the company assigned to Varney).  Although Varney questions why the later submission, with the

lower hourly rate, is relevant to her credibility, the fact that Varney attributed a lower wage for

the same work during the same years could rationally be viewed as evidence that her work

activity statements were entirely within her control to be manipulated as she saw fit without

regard to how the company actually valued her work.  This is a valid basis on which to question

Varney's credibility.

Similarly, the fact that Varney's interest was decreased from 25% to 5% in June 2002 is a

viable reason for questioning Varney's credibility.  Varney at first informed the Social Security

Administration that her 25% share "is completely unrelated to the amount of work I perform . . . I

receive these funds even if I am not able to work at all[.]"  Tr. 30.  Yet, in her testimony she

explained to the ALJ that her share was reduced to more accurately reflect her participation level.

The ALJ could have accepted this statement, or not.  In the hearing, the ALJ questioned Varney

about the minutes and described what he had seen before as the "eye wash of those corporate

minutes[.]"  Tr. 276.  The exchange went as follows:

Q:  One exhibit here is Exhibit B15 [the minutes].

A:  Um-hum.

Q:  This is about the time that Social Security is checking into where these wages are coming from and all of a sudden there's a partner meeting, which is you and your significant other here.

A:  Right.

Q:  And it just says everything is changed.  Now why is this not just eye wash? Because this is about the same time Social Security is making some inquiries about these –about this money being posted back in 2002.  Do you know what I'm talking about here?

A:  I do understand – yes.

Tr. 276.  The ALJ's conclusion that the redistribution was an example of Varney attempting to change the facts "in a manner intended to preserve her disability income," Tr. 30, is a rational interpretation of the record, and is supported by inferences reasonably drawn from the record. Batson, 359 F.3d at 1193.  It was appropriate for the ALJ to question Varney's motivation for changing her ownership in the company.  If her income was truly based on her ownership interest, the ALJ properly wondered, why bother to redistribute the ownership units?

Varney takes issue with the ALJ's characterization of her work.  Arguing that he improperly found an inconsistency in her testimony and reports, she focuses in particular on the ALJ's statements in the third paragraph on page 29 of the transcript.  In contrast to Varney's reading, the purpose of that paragraph is to underscore that while Varney did not believe her role (performing bookkeeping, proofreading, layout feedback, scientific analysis, and attending client and internal meetings) brought value to the company, the company needed someone to fulfill administrative and management tasks like the ones she performed.  Consequently, although Varney did not perform the website development and design, which was the core of the business, her work was integral to generating income for the business.  Nevertheless, as I noted above, the

Page 13 - OPINION AND ORDER

ALJ neglected to evaluate whether the work Varney performed constituted a significant service pursuant to the regulations.

Finally, the ALJ pointed out that Varney failed to report to the SSA that she was engaging in work activity. Benefit recipients are repeatedly told "of their legal obligation to report ANY type of work activity in [a] timely fashion, regardless of how minimal, and whether receiving wages or being self-employed." Tr. 30. Varney failed to make any such report to the SSA.

However, since none of these inconsistencies noted by the ALJ speak directly to whether Varney performed significant services for the company, these reasons alone would not be sufficient to find Varney's testimony not credible that she worked only approximately ten hours a month. The ALJ may consider these inconsistencies in evaluating Varney's credibility but should take a fresh look at her testimony and record evidence, or hold another hearing.

III.    Lay Testimony

Lay testimony is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness. Stout v. Comm'r of Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006).

Again, Varney focuses on the ALJ's inaccurate quotations. Schick, according to the ALJ, testified that he is "the 'owner of Sentis . . . and that the claimant also 'works for the business,' doing 'basic bookkeeping and accounting, that's it.' He testified that she doesn't do any of the software design work, and has never done 25% of the work, and 'has never been able to work more than 10 hours per month.'" Tr. 27. In fact, Schick, when asked a question about having a business, answered in the affirmative, confirmed that Varney also worked for the business, testified that Varney does bookkeeping and accounting "primarily" and some proofreading as

Page 14 - OPINION AND ORDER

well as some miscellaneous things, and that "she's basically not been able to work more than 10 hours, I think, a month as long as I could remember." Tr. 285.

Varney admits that the ALJ did not get the gist of the testimony wrong, but she claims the ALJ gave Schick's testimony a different tone than was expressed in reality. It is true that the ALJ placed quotations around statements not made by anyone. Nevertheless, Varney cannot point to any relevant errors the ALJ made in summarizing Schick's testimony.

Varney complains that the ALJ misrepresented Schick's testimony that Varney's investment decreased from 25% to 5% because "she was unable to do more than 5% of the work" believing that the ALJ was not correctly capturing Schick's view that Varney's ability to work had always remained limited. However, in the preceding sentence the ALJ reported Schick's testimony that Varney had never been a full partner in the business. I find no factual error relevant to the ALJ's analysis.

Nevertheless, I agree with Varney that the ALJ's rejection of Schick's testimony as being "consistent with . . . coordinated with" Varney's is odd given the ALJ's earlier comment on the "major discrepancy" between Schick's and Varney's testimony about the number of hours Varney worked. Tr. 30, 27. Additionally, the ALJ's reasoning that Schick was motivated to support Varney's allegations because the two were in a personal and business relationship, is insufficient on its own to provide a germane reason to reject a lay witness's testimony. Smolen, 80 F.3d 1273, 1289; Valentine v. Comm'r Social Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009) (personal relationship rationale is not germane on its own); but see Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006) (close relationship in addition to inconsistences qualify as germane reasons). The ALJ must re-evaluate Schick's testimony.

Finally, the ALJ properly described the lay witness statements which all, without exception, contained the same phrase about the desire of the witness to correct the "misperception" of the Social Security Administration about how much Varney could and did work.  See Tr. 139 (Stanbridge wrote to "attest to [her] knowledge of [Varney's] work responsibilities" because she was "aware that [Varney] is trying to reinstate her disability status" and that the SSA had "misperceptions of her work at Sentis"); Tr. 140 (Unruh wrote to "attest to [her] knowledge of [Varney's] work" because she knew Varney was "struggling to correct some misperceptions of her work at Sentis"); Tr. 141 (Boekelheide wrote to "attest to [his] knowledge of [Varney's] work at Sentis" because Varney was "struggling with some misperceptions of her work at Sentis"); Tr. 142 (Kahane wrote to "attest to [her] knowledge of [Varney's] work at Sentis" because she heard Varney was "struggling to reinstate her disability due to some misperceptions of her work at Sentis").

Although, as Varney points out, each letter contained a different summary about each witness's observations of her, it was apparent to the ALJ that Varney "directed the content of the letters[.]"  Tr. 30.  Varney herself admitted to writing an outline for the witnesses.  As a result, the ALJ viewed the letters as containing "the claimant's comments" and, therefore, as not being particularly probative on the issue of the work Varney performed for the company.  Tr. 30. Varney, in fact, reiterates in her submission to this Court that she "provided a bullet point outline of the issues in this case[.]"  Pl.'s Mem. at 44.  The ALJ gave a germane reason to reject the letters submitted by the lay witnesses–that they were directed by Varney– which was a rational interpretation of the evidence.

For the reasons stated above, the ALJ should re-evaluate Schick's testimony.

**CONCLUSION**

The decision of the Commissioner is reversed.  This action is remanded to the

Commissioner under sentence four of 42 U.S.C. § 405(g) for rehearing to further develop the

record as explained above.  Judgment will be entered.

IT IS SO ORDERED.

Dated this _____ 20th _____ day of April, 2011.


                              __/s/ Garr M. King_____
                              Garr M. King
                              United States District Judge